**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


Coach, Inc. and
Coach Services, Inc.

     v.                                    Case No. 10-cv-141-LM

Gata Corporation, Martin
Taylor, and John Does
1 through 20


**O R D E R**


    Coach, Inc. and Coach Services, Inc. (collectively "Coach")
have sued in ten counts, seeking both damages and injunctive
relief arising from the alleged sale of goods that infringe or
dilute their intellectual property at a flea market that is
operated by Gata Corporation ("Gata") and Martin Taylor.[1]  Before
the court are: (1) Coach's motion for summary judgment on Count
I (contributory trademark infringement); and (2) Coach's motion
to strike a document defendants submitted in support of their

---

[1] Coach has sued John Does 1 through 20 for trademark
infringement (Count VI), counterfeiting (Count VII), trade dress
infringement (Count VIII), copyright infringement (Count IX),
and trademark dilution and tarnishment (Count X).  In addition,
Coach has sued Gata and Taylor for contributory trademark
infringement (Count I), contributory counterfeiting (Count II),
contributory trade dress infringement (Count III), vicarious
and/or contributory copyright infringement (Count IV), and
contributory trademark dilution and tarnishment (Count V).

objection to Coach's motion for summary judgment.  Defendants
oppose the motion for summary judgment, but have not responded
to the motion to strike.  For the reasons that follow, Coach's
summary judgment motion is granted and its motion to strike is
denied.

### Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to a judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  "The object of summary judgment is to "pierce
the boilerplate of the pleadings and assay the parties' proof in
order to determine whether trial is actually required.'"  Dávila
v. Corporación de P.R. para la Diffusión Pública, 498 F.3d 9, 12
(1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386
F.3d 5, 7 (1st Cir. 2004)).  "[T]he court's task is not to weigh
the evidence and determine the truth of the matter but to
determine whether there is a genuine issue for trial."  Noonan
v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and
internal quotation marks omitted).

"Once the moving party avers an absence of evidence to
support the non-moving party's case, the non-moving party must
offer 'definite, competent evidence to rebut the motion,'"
Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009)

(citing <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d 816, 822 (1st Cir.
1991)), and "cannot rest on 'conclusory allegations, improbable
inferences, [or] unsupported speculation,'" <u>Meuser</u>, 564 F.3d at
515 (quoting <u>Welch v. Ciampa</u>, 542 F.3d 927, 935 (1st Cir.
2008)).  When ruling on a party's motion for summary judgment, a
trial court "constru[es] the record in the light most favorable
to the nonmovant and resolv[es] all reasonable inferences in
[that] party's favor."  <u>Meuser</u>, 564 F.3d at 515 (citing
<u>Rochester Ford Sales, Inc. v. Ford Motor Co.</u>, 287 F.3d 32, 38
(1st Cir. 2002)).

**Background**

Before sketching the relevant factual background, the court
turns to two procedural matters that have a direct bearing on
the content of the summary judgment record.  The first arises
out of the discovery process while the second relates to
defendants' objection to Coach's summary judgment motion.

A. Requests for Admissions

On December 15, 2010, Coach served defendants with a set of
requests for admissions.  Techentin Decl. (doc. no. 40-2) ¶ 1.
Under a cover letter dated January 19, 2011, defendants' counsel
served Coach with an answer to its requests.  Doc. no. 40-5.
The document defendants' counsel served on Coach was dated

January 15, 2011, and bore a facsimile of Martin Taylor's
handwritten signature.  Shortly after receiving defendants'
answer, Coach's counsel advised defendants' counsel that the
answer was untimely, and that Coach would, accordingly, treat
the matters covered in its requests as admitted, unless the
court made a determination to the contrary.  It is undisputed
that defendants' counsel did not respond to Coach's counsel, did
not move the court to enlarge the time for serving defendants'
answer, and has not moved to withdraw their admissions.
Instead, on March 14, defendants filed with the court, as an
exhibit to their objection to Coach's motion for summary
judgment, a different version of their answer to Coach's
requests for admissions than the one their counsel served on
Coach.  The version defendants filed with the court was dated
January 8, rather than January 15, and bore Taylor's typewritten
signature, rather than a facsimile of his handwritten signature.

     After noting the differences between the document it was
served by defendants' counsel and the document defendants filed
with the court, Coach moved to strike the version of defendants'
answer that was attached to their objection to summary judgment,
on grounds of its falsity.  See doc. no. 40.  Defendants have
not objected to Coach's motion to strike.  Coach also continues
to maintain that the matters covered in its requests for

admissions should be deemed admitted, pursuant to Rule 36(a)(3) of the Federal Rules of Civil Procedure (hereinafter "Federal Rules").  For their part, defendants do acknowledge, if obliquely, that "[i]n our case, there may have been a 2 day delay" in serving their answer to Coach's requests for admissions.  Defs.' Mem. of Law (doc. no. 38-4), at 6.

After careful consideration of the relevant circumstances, the court concludes that the matters covered in Coach's requests for admissions should be admitted.  Under the Federal Rules, "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney."  Fed. R. Civ. P. 36(a)(3).  Here, defendants failed to serve their answer within thirty days.  The Federal Rules provide that a longer time for responding may "be ordered by the court," id., but defendants have never moved the court for such an order.  The Federal Rules also provide that the court may, under certain circumstances, "permit[ ] [an] admission to be withdrawn or amended."  Fed. R. Civ. P. 36(b).  Such permission, however, is to be granted "on motion."  Id.  Defendants have not moved to withdraw their admissions, and the reference to Rule 36(b) in their objection to summary judgment is insufficient to invoke

the protection of that rule.  <u>See</u> LR 7.1(a)(1) ("Objections to pending motions and affirmative motions for relief shall not be combined in one filing.").  Defendants' failure to file a motion to withdraw their admissions – after having been given fair warning of Coach's intent to rely on those admissions approximately two weeks before Coach filed its summary judgment motion – renders <u>Pritchard v. Dow Agro Sciences</u>, 255 F.R.D. 164 (W.D. Pa. 2009), inapposite.  Unlike the party seeking to withdraw its admissions in <u>Pritchard</u>, defendants in this case have not filed a motion to withdraw their admissions. Accordingly, the matters covered in Coach's requests for admissions are admitted.

    <u>B. Defendants' Objection</u>

    Coach also points out, in its reply to defendants' objection to summary judgment, that defendants have not properly opposed the statement of undisputed material facts set out in the memorandum of law in support of its summary judgment motion. Coach's point is well taken.

    The Local Rules of this court require a party moving for summary judgment to submit a memorandum that "incorporate[s] a short and concise statement of material facts, supported by appropriate record citations, as to which the moving party contends there is no genuine issue to be tried."  LR 7.2(b)(1).

Coach's memorandum incorporates such a statement.  The Local
Rules also provide:

> A memorandum in opposition to a summary judgment
> motion shall incorporate a short and concise statement
> of material facts, supported by appropriate record
> citations, as to which the adverse party contends a
> genuine dispute exists so as to require a trial.  All
> properly supported material facts set forth in the
> moving party's factual statement shall be deemed
> admitted unless properly opposed by the adverse party.

LR 7.2(b)(2).  Defendants' objection does not incorporate the
statement required by LR 7.2(b)(2).  Accordingly, all the
properly supported material facts in Coach's factual statement
are deemed admitted.  See Zimmerman v. Puccio, 613 F.3d 60, 63
(1st Cir. 2010) (reiterating the importance of rules such as LR
7.2(b)(2) and stating the First Circuit's policy of treating
trial courts' decisions to apply those rules with deference)
(citing Carreras v. Sajo, García & Partners, 596 F.3d 25, 31
(1st Cir. 2010)).

The court further notes that defendants have produced three
items of evidence in support of their objection to Coach's
summary judgment motion: (1) the January 8 version of Taylor's
answer to Coach's requests for admissions; (2) Taylor's
deposition; and (3) Taylor's affidavit.  In that defendants rely
on Taylor's answer to the requests for admissions primarily for
its "important denials," rather than for any affirmative
evidence contained therein, the contribution of that answer to

the summary judgment record seems marginal, at best.  <u>See</u>
<u>Sensing v. Outback Steakhouse of Fla., LLC</u>, 575 F.3d 145, 152
(1st Cir. 2009) ("At this stage, the nonmoving party may not
rest upon mere allegation or denials . . . but must set forth
specific facts showing that there is a genuine issue of material
fact . . . .") (quoting <u>DeNovellis v. Shalala</u>, 124 F.3d 298, 306
(1st Cir. 1997)).

As for Taylor's affidavit and deposition testimony, that
evidence is properly a part of the summary judgment record but,
to the extent there is any conflict between facts stated in the
affidavit and deposition and facts stated in Coach's requests
for admissions, the facts stated in the requests for admissions
control.  That is because "[m]atters admitted in accordance with
Rule 36, whether explicitly admitted or admitted by default, are
conclusively established."  James Wm. Moore, 7 <u>Moore's Federal</u>
<u>Practice</u> § 36.03[2], at 36-14.  Moreover, "[a]ny admission that
is not amended or withdrawn cannot be rebutted by contrary
testimony or ignored by the court even if the party against whom
it is directed offers more credible evidence."  <u>Id.</u> at 36-15.

<u>C. The Relevant Facts</u>

As a result of defendants' failure to serve Coach with a
timely response to its requests for admissions, and their
failure to properly oppose the factual statement in Coach's

memorandum of law, the following description of the factual background is drawn largely from Coach's properly supported statement of undisputed facts.

Coach manufactures and sells high-end purses, handbags, and other similar items.  It also holds an extensive portfolio of intellectual property including trademarks, trade dress, and copyrights.

Gata operates a flea market in Derry, New Hampshire ("Flea Market) known variously as the Grandview Flea Market and as the Derry Flea Market.  Taylor is Gata's sole owner and shareholder. He also works regularly at the Flea Market.

In 2005, vendors selling counterfeit[2] purses, handbags, and related goods[3] first began renting spaces at the Flea Market. The Flea Market requires purse vendors to pay a rental fee for booth space that is higher than the fee paid by vendors who do not sell purses.  As early as 2005, defendants knew that vendors at the Flea Market were selling counterfeit Coach merchandise. Counterfeit Coach purses are distinguishable from authentic ones on the basis of both workmanship and price, with authentic Coach

---

[2] For convenience, the court will use the word "counterfeit" to refer to both counterfeit goods, as defined by the Lanham Act, and to all other kinds of infringing goods.

[3] For convenience, the court will use the word "purses" interchangeably with "merchandise" to refer to the full range of counterfeit items at issue in this case.

purses selling for $300, on average, and counterfeits selling at the Flea Market for less than $20.  Since 2005, the percentage of vendors selling counterfeit purses at the Flea Market has increased to the point where most of the vendors who rent spaces there sell counterfeit purses, including counterfeit Coach purses.

The Flea Market has been raided by federal and state law-enforcement officers on at least four occasions, starting in June of 2009.[4]  Those raids resulted in the seizure of, among other things, thousands of counterfeit Coach purses.  Those raids also resulted in the arrest and prosecution of several vendors for selling, among other things, counterfeit Coach merchandise.  In addition, surveys conducted by Powers & Associates (a private detective agency), the federal Bureau of Immigration and Customs Enforcement, and the Derry Police have enumerated dozens of vendors offering, collectively, thousands of counterfeit items for sale at the Flea Market in early 2008, May of 2008, the end of 2008, June of 2009, and October of 2009.

By letter dated August 4, 2009, Coach's manager of intellectual property informed Taylor of Coach's concern over the sale of counterfeit Coach purses at the Flea Market and directed Taylor to take various steps to curtail those sales.

---

[4] Subsequent raids took place in October and December of 2009, and January of 2010.

At some point after the initial raid, defendants posted a sign stating that no Coach merchandise could be sold at the Flea Market, and they had Flea Market employees conduct occasional walk-throughs, to determine whether vendors were selling counterfeit merchandise.  Defendants took no other steps to prevent infringing activity.  After the initial raid in June of 2009, surveys continued to show that vendors were offering counterfeit Coach merchandise for sale.

On March 20, 2010, Andrea Powers of Powers & Associates visited the Flea Market at Coach's request.  She saw several vendors offering counterfeit Coach merchandise for sale, in plain view.  Powers was able to purchase counterfeit Coach merchandise from four vendors, each of whom concealed their counterfeit merchandise in their booths, and took care to wrap Powers' purchases and place them inside her tote bag, out of view.  On one visit to the Flea Market, while Powers was waiting to speak with a vendor about purchasing a counterfeit Coach purse, she overheard an employee of the Flea Market tell a vendor with counterfeit merchandise on display that such goods had to be kept under the table rather than out in the open.

This suit arises from Coach's allegations that numerous vendors at the Flea Market have sold goods that infringe on and/or tarnish their trademarks, trade dress, and/or copyrights.

In Count I of its complaint, the only claim at issue here, Coach
asserts that Gata and Taylor are liable for contributory
trademark infringement because with actual knowledge of or
willful blindness to the infringing conduct of Flea Market
vendors, they have permitted those vendors to sell items that
infringe Coach's trademarks.

## Discussion

Coach moves for summary judgment on Count I, arguing that
on the undisputed facts, it is entitled to judgment as a matter
of law that defendants are liable for contributory trademark
infringement.  Without properly identifying any factual disputes
that would preclude summary judgment, defendants argue that: (1)
summary judgment is rarely granted in willful blindness cases;
(2) the standard for establishing willful blindness is exacting;
and (3) the evidence does not support summary judgment.
Defendants' third argument is based, in large measure, on a
page-long list of "important denials" contained in its untimely
answer to Coach's requests for admissions and testimony in
Taylor's affidavit and deposition that the court cannot consider
because it conflicts with matters that have been conclusively
established by means of defendants' admissions.

The Lanham Act identifies several forms of conduct that
constitute actionable trademark infringement.  See 15 U.S.C. §§

12

1114(a) & 1125(a).  Liability under the Lanham Act may be
imposed not just on direct infringers, but also on those who
induce or facilitate the infringing conduct of others.  See
Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 853-54
(1982)).  In a case that involved claims that a generic drug
manufacturer was liable for contributory trademark infringement,
the United States Supreme Court explained:

> [I]f a manufacturer or distributor intentionally
> induces another to infringe a trademark, or if it
> continues to supply its product to one whom it knows
> or has reason to know is engaging in trademark
> infringement, the manufacturer or distributor is
> contributorily responsible for any harm done as a
> result of the deceit.

Id. at 854 (citing William R. Warner & Co. v. Eli Lilly & Co.,
265 U.S. 526 (1924); Coca-Cola Co. v. Snow Crest Bevs., Inc., 64
F. Supp. 980 (D. Mass. 1946)).  The doctrine of contributory
trademark infringement has been extended from the factual
context in which it first arose into settings substantially
analogous to the one presented here.

In a case involving a claim of contributory trademark
infringement brought against the operator of a flea market that
included vendors selling infringing goods, the Seventh Circuit
held "that the Inwood Labs. test for contributory liability
applie[d]" and that the flea-market operator could "be liable
for trademark violations by [a vendor] if it knew or had reason

13

to know of them."  Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc., 955 F.2d 1143, 1149 (7th Cir. 1992).  The court went on to hold that the knowledge requirement could be met by a demonstration of willful blindness, id. (citation omitted), which it defined as follows: "To be willfully blind, a person must suspect wrongdoing and deliberately fail to investigate." Id. (citation omitted).  The court further explained that "the 'reason to know' part of the standard for contributory liability requires [the defendant] to understand what a reasonably prudent person would understand."  Id.  Ultimately, the court of appeals vacated the trial court's decision in favor of the trademark owner, after a bench trial, because the trial court used a standard for knowledge that was more akin to negligence than willful blindness.  Id.

In another flea-market case, the Ninth Circuit reversed the trial court's dismissal of a claim for contributory trademark infringement against a swap meet, explaining that "Hard Rock Cafe's application of the Inwood test is sound; a swap meet can not disregard its vendors blatant trademark infringements with impunity."  Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 265 (9th Cir. 1996).

In Tiffany (NJ) Inc. v. eBay Inc., a case in which the defendant was the operator of an on-line marketplace, the Second

Circuit restated the Inwood test to make it more applicable to an accused contributory infringer that provides services rather than goods:

> [W]hen applying Inwood to service providers, there are two ways in which a defendant may become contributorially liable for the infringing conduct of another: first, if the service provider "intentionally induces another to infringe a trademark," and second, if the service provider "continues to supply its [service] to one whom it knows or has reason to know is engaging in trademark infringement."

600 F.3d 93, 106 (2d Cir. 2010) (quoting Inwood, 456 U.S. at 854). In the district court order holding the defendant not to be liable for contributory infringement that was affirmed in Tiffany, the trial judge explained: "Willful blindness requires 'more than mere negligence or mistake' and does not lie unless the defendant knew of a high probability of illegal conduct and purposefully contrived to avoid learning of it, for example, by failing to inquire further out of fear of the result of the inquiry." Tiffany (NJ) Inc. v. eBay, Inc., 576 F. Supp. 2d 463, 515 (S.D.N.Y. 2008) (quoting Nike Inc. v. Variety Wholesalers, Inc., 274 F. Supp. 2d 1352, 1369-70 (S.D. Ga. 2003)).

Based on their objection to Coach's motion for summary judgment, defendants appear to concede the underlying acts of direct trademark infringement by Flea Market vendors, in violation of 15 U.S.C. §§ 1114(a) and 1125(a), on which Count I is based. Their objection to summary judgment rests on one

15

factual argument and one legal argument.  Factually, they argue
that Coach has not met its burden of producing evidence that
they possessed the requisite level of specific knowledge of
infringing activity to be held liable for contributory
infringement.  Legally, they argue that Coach overstates the
amount of affirmative action they were required to take to
police Coach's trademarks.  The court considers each argument in
turn.

Defendants' factual argument is based on the opinions in
Tiffany, and in particular, the holding that "[f]or contributory
trademark infringement liability to lie, a service provider must
have more than a general knowledge or reason to know that its
service is being used to sell counterfeit goods."  600 F.3d at
107.  According to defendants, Coach has failed to produce
evidence that they had anything more than general knowledge of
infringing activities at the Flea Market.  The court does not
agree.

As a preliminary matter, the court notes that Tiffany, and
the two cases on which it relies in its discussion of general
knowledge, Inwood and Sony Corp. of America v. Universal City
Studios, Inc., 464 U.S. 417 (1984), involved situations where
the infringing activity and the alleged contributory infringer
were physically remote from one another.  In Tiffany, the

infringers were sellers using the defendant's online
marketplace.  600 F.3d at 96.  In Inwood, the infringers were
pharmacists who dispensed a generic drug manufactured by the
defendant.  456 U.S. at 846.  In Sony, the infringers were
people who used devices manufactured by the defendant to record
television programs in their homes.  464 U.S. at 419.  Here, by
contrast, the infringers are vendors who bring their merchandise
to a venue operated and patrolled by defendants on a daily
basis.  The issue of proximity, in turn, is related to the issue
of control, which is a key component of the analysis:

> [T]he Ninth Circuit concluded that Inwood's test for
> contributory trademark infringement applies to a
> service provider if he or she exercises sufficient
> control over the infringing conduct.  Lockheed Martin
> Corp. v. Network Solutions, Inc., 194 F.3d 980, 984
> (9th Cir. 1999); see also id. ("Direct control and
> monitoring of the instrumentality used by a third
> party to infringe the plaintiff's mark permits the
> expansion of Inwood Lab.'s 'supplies a product'
> requirement for contributory infringement.").

Tiffany, 600 F.3d at 104-05.  Suffice it say that the operator
of a flea market that rents spaces to vendors exercises
substantially more control over potential infringers than the
defendants in Tiffany, Inwood, and Sony exercised over the
infringers in those case.

Given the circumstances of this case, Coach has met its
burden of producing undisputed evidence of defendants' knowledge
of the underlying infringement.  It is conclusively established

that: (1) "Defendants knew that Counterfeit Merchandise, including the Coach Counterfeit Merchandise, had been offered for sale and sold by vendors to customers at the . . . Flea Market prior to June of 2009 and as early as 2005," Pl.'s Reqs. for Admiss. #16; (2) "After the first raid of the . . . Flea Market by federal and local law enforcement officials in June 2009, . . . Defendants knew that Counterfeit Merchandise, including the Coach Counterfeit Merchandise, continued to be offered for sale and sold by vendors to customers at the . . . Flea Market," id. #23; (3) "In 2010, Defendants knew and continue to know that Counterfeit Merchandise, including the Coach Counterfeit Merchandise, has been offered for sale and sold by vendors to customers at the . . . Flea Market," id. #32; and (4) "Prior to the 2009 and 2010 raids on the . . . Flea Market by federal and local law enforcement officials, the Counterfeit Merchandise offered for sale at the Flea Market, including the Counterfeit Coach Merchandise, was openly displayed for sale by vendors at the . . . Flea Market," id. #36.

While it might be argued that the admissions quoted above demonstrate only general knowledge of infringement, rather than specific knowledge, it is important to bear in mind that a flea-market operator with general knowledge of infringing activity by

vendors is hardly analogous to a web site operator, a drug
manufacturer, or a manufacturer of home electronics with general
knowledge of infringing activity by online vendors, pharmacists,
or television viewers.  Unlike the other three, who would have
to conduct complicated investigations to confirm and specify
their general knowledge, all Taylor had to do was step out of
his ticket booth and take a walk around the Flea Market.
Moreover, it is conclusively established that counterfeit goods
were openly displayed at the Flea Market.  And, it is undisputed
that a reasonable person could have easily identified the
counterfeit goods offered for sale at the Flea Market based on
their dramatically low prices.[5]  Finally, once law-enforcement
agencies began raiding the Flea Market, arresting vendors, and
seizing counterfeit merchandize, a lack of specific knowledge on
defendants' part could only have resulted from willful
blindness; those raids provided defendants with a veritable

---

[5] As Hard Rock Cafe makes clear, the "reason to know"
standard is based on what a reasonably prudent person would
understand, see 955 F.2d at 1149, not what would be understood
by a person as uninformed as Taylor makes himself out to be in
his affidavit, see Defs.' Obj. Ex. A (doc. no. 38-1) ¶¶ 2-5.  In
any event, because the affidavit in which Taylor asserts an
ignorance of handbags that precluded him from identifying
counterfeits contradicts evidence of his knowledge of the
presence of counterfeit bags at the Flea Market that has been
conclusively admitted, his affidavit must be disregarded.  See
Moore, supra, § 36.03[2], at 36-15 ("[A]ny matter conclusively
established is treated as a judicial admission, not an
evidentiary admission.  Thus, both the court and the parties are
bound by admissions.").

roadmap to infringing vendors and merchandise.  Similarly, the
fact that defendants did not train the employees conducting
occasional walk-throughs to search for counterfeit merchandise
counts as a deliberate failure to investigate suspected
infringing activity, see Hard Rock Cafe, 955 F.2d at 1149, or a
purposeful contrivance to avoid learning of infringing activity,
see Tiffany, 576 F. Supp. 2d at 515, sufficient to establish
willful blindness.  In sum, the court has no difficulty
concluding that Coach has produced undisputed evidence that
defendants rented spaces at the Flea Market to vendors it knew,
or should have known, were engaging in infringing activity.

     Defendants' principal argument is the one addressed above,
i.e., that Coach has failed to produce undisputed evidence that
they knew about, or should have known about, the infringing
activity of vendors at the Flea Market.  Defendants also appear
to raise – but not fully develop – a second argument related to
the degree to which they were legally obligated to monitor and
control the activities of their vendors.  In defendants' view,
the various steps they took to clamp down on infringing activity
after the 2009 raid were sufficient under the law.  In so
arguing, defendants rely on Tiffany for the proposition that the
law did not require them to further police Coach's trademarks.
In terms of the elements of Coach's cause of action, the

obligation of a person in defendants' position to prevent

infringement by another would appear to derive from the rule

that one who has knowledge of the infringing acts of another is

liable for that other person's infringement when he or she

"continues to supply [a] [service] to [the infringer]."

Tiffany, 600 F.3d at 106.

In Tiffany, there were two categories of underlying

infringers: (1) those that eBay knew to be selling counterfeit

goods; and (2) those that Tiffany said eBay should have known to

be selling counterfeit goods.  The former are the proper analog

to the infringers in this case, given the court's disposition of

defendants' claim that they lacked sufficient knowledge of the

infringing acts of the Flea Market's purse vendors.  With

respect to them, as soon as "eBay [had] reason to know that

particular listings were for counterfeit goods, eBay did not

continue to carry those listings once it learned that they were

specious."  600 F.3d at 106.  Moreover:

> The [trial] court found that eBay's practice was
> promptly to remove the challenged listing from its
> website, warn sellers and buyers, cancel fees it
> earned from that listing, and direct buyers not to
> consummate the sale of the disputed item.  The court
> therefore declined to hold eBay contributorially
> liable for the infringing conduct of those sellers.

Id. (citations to the district court order omitted).  The
plaintiff in Tiffany did not challenge that ruling, and the
court of appeals agreed with the trial court.  Id.

     Here, defendants' handling of the vendors it knew or should
have known to be infringing Coach's trademarks falls far short
of the standard the Tiffany Court held to be sufficient to avoid
liability for contributory infringement.  It has been
conclusively established that after the first raid on the Flea
Market, defendants took only two steps to prevent the sale of
counterfeit Coach merchandise: posting a sign stating that no
Coach merchandise could be sold at the Flea Market and
conducting occasional walk-throughs to see if any counterfeit
Coach merchandise was being sold.  It has also been conclusively
established that: (1) defendants do not inspect vendors'
merchandise before allowing them to set up; (2) the walk-
throughs that defendants perform are not conducted on a regular
basis and are not designed to prevent the sale of counterfeit
merchandise; and (3) the employees conducting those walk-
throughs are not trained in how to detect counterfeit
merchandise or sales thereof.  Unlike eBay, which disallowed
infringers from using its service, defendants have never asked a
vendor to leave the Flea Market for selling counterfeit Coach
items.  This is so, notwithstanding Taylor's testimony that

after the first raid, the Flea Market instituted a policy of
evicting vendors for selling counterfeit goods, and the
undisputed fact that two of the Flea Market's employees have
caught vendors in the act of selling counterfeit name-brand
merchandise on at least twenty-five occasions.  Finally, it is
undisputed that on at least one occasion, a Flea Market employee
counseled a vendor on how to hide the counterfeit merchandise in
his or her booth.  Teaching a vendor how to conceal infringing
merchandise drifts perilously close to, and may well cross, the
line between allowing known infringers to use its service and
actually inducing infringement.

The bottom line is this.  Like the defendant in <u>Tiffany</u>,
defendants in this case knew that vendors were using the service
they provided to conduct infringing activities.  The defendant
in <u>Tiffany</u> barred those known infringers from using its service.
Gata and Taylor did not.

Because the undisputed factual record demonstrates that
defendants continued to supply the services of the Flea Market
to vendors it knew to be engaging in trademark infringement
and/or vendors it had reason to know were engaging in trademark
infringement, Coach is entitled to judgment as a matter of law
on Count I.

**Motion to Strike**

The court has already alluded to Coach's motion to strike the January 8 version of defendants' answer to the requests for admissions.  Because the court must disregard that document, for reasons explained above, Coach's motion to strike is effectively moot, but for Coach's request to have defendants' counsel pay the attorneys' fees and costs it incurred in filing the motion. Because Coach has not identified the authority under which the court should, or could, grant its request for attorneys' fees, that request is denied.

**Conclusion**

For the reasons given, Coach's motion for summary judgment on Count I, doc. no. 31, is granted, and its motion to strike, doc. no. 40, denied.

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge


April 26, 2011

cc:  Kelly Martin Malone, Esq.
     Thomas Morgan, Jr., Esq.
     Adam M. Ramos, Esq.
     Jeffrey K. Techentin, Esq.