**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Coach, Inc. and
Coach Services, Inc.

    v.                         Case No. 10-cv-141-LM

Gata Corporation
and Martin Taylor


**O R D E R**


    Before the court is defendants' motion to reconsider the court's order of April 26, 2011, which granted summary judgment to Coach, Inc. and Coach Services, Inc. (collectively "Coach") on Count I of their complaint against Gata Corporation and Martin Taylor.  Coach objects.  For the reasons that follow, defendants' motion for reconsideration is granted, but even so, Coach is entitled to summary judgment on its claim for contributory trademark infringement.

**Withdrawal of Admissions**

    On December 15, 2010, Coach served defendants with a set of requests for admissions.  Under a cover letter dated January 19, 2011, defendants' counsel served Coach with answers to its requests.  By letter dated January 27, 2011, Coach's counsel advised defendants' counsel that the answers were untimely, and

that Coach would, accordingly, treat the matters covered in its requests as admitted, by operation of Rule 36(a)(3) of the Federal Rules of Civil Procedure ("Federal Rules") unless the court made a determination to the contrary. Defendants' counsel did not respond to Coach's counsel. Moreover, defendants did not move the court to enlarge the time for serving answers to Coach's requests for admissions, and have never formally moved to withdraw their admissions.

Having given defendants fair warning of its intent to rely on their admissions, Coach moved for summary judgment on Count I approximately two weeks later, on February 14, 2010. In its summary judgment motion, Coach indicated that it was relying, in part, on the matters it deemed to be admitted as a result of defendants' untimely response to its requests for admissions. In its objection to Coach's summary judgment motion, defendants conceded that their answers to Coach's requests for admission may have been two days late and, in reliance on Rule 36(b) and Pritchard v. Dow Agro Sciences, 255 F.R.D. 164 (W.D. Pa. 2009), sought to withdraw and/or amend their admissions.

The rule on which defendants rely provides, in pertinent part: "A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b) (emphasis

added).  In Pritchard, on which defendants also relied, the
facts were these: (1) the plaintiffs' answers to defendants'
requests for admissions were due on July 21, 2008, 255 F.R.D. at
168; (2) on that date, the plaintiffs asked for, and received
from the defendants, a thirty-day enlargement of time to serve
their answers, id.; (3) on the last day of the agreed-upon time
for serving answers, August 20, the plaintiffs' counsel left a
phone message with the defendants' counsel indicating that he
would mail answers later that day or the next morning, id.; (4)
on August 25, the defendants' counsel received the plaintiffs'
answers along with a letter apologizing for the delay, id. at
169; (5) at an August 28 case-management conference, the
defendants' counsel notified the plaintiffs' counsel and the
court of the lateness of the plaintiffs' answers, and told the
plaintiffs' counsel "that the result of [plaintiffs'] untimely
response was that the [requests for admissions] were deemed
admitted, unless Plaintiffs filed a motion to withdraw," id.;
and (6) on September 15, the "Plaintiffs filed [a] Motion to
Withdraw Admissions and to Extend Time for Filing," id. at 170.
After conducting an extensive analysis under Rule 36(b), the
court in Pritchard granted the plaintiffs' motion to withdraw
their admissions.  Id. at 174.

3

Based on the "on motion" language in Rule 36(a) and the
fact that the plaintiffs in Pritchard filed an actual motion to
withdraw their admissions, this court held that because
defendants never formally moved to withdraw their admissions,
the request to do so presented in their objection to Coach's
summary judgment motion was insufficient.

Now, in their motion for reconsideration, defendants argue
that the court committed a manifest error of law by failing to
allow them to withdraw and/or amend their answers to Coach's
requests for admissions.  Given that decisions concerning the
withdrawal of admissions are subject to the discretion of the
trial court, see Fed. R. Civ. P. 36(b); Siguel v. Allstate Life
Ins. Co., 48 F.3d 1211 (1st Cir. 1995) (unpublished table
decision), 1995 WL 98240, at *4 (citing Farr Man & Co. v. M/V
Rozita, 903 F.2d 871, 876 (1st Cir. 1990)), it is not so clear
that failure to allow the withdrawal of an admission could
constitute a manifest error of law.  But, defendants are correct
in pointing out that several courts have held that a formal
motion to withdraw is not necessary.  See 7 James Wm. Moore,
Moore's Federal Practice § 36.13, at 36-45 (3d ed. 2010) ("A
formal written motion to withdraw is not necessary."); United
States v. Petroff-Kline, 557 F.3d 285, 294 (6th Cir. 2009)
("Despite its failure to have filed a formal motion to withdraw

its claimed admissions, the Government's filing of a slightly overdue response effectively served as such a withdrawal."); Kirtley v. Sovereign Life Ins. Co. of Cal. (In re Durability, Inc.), 212 F.3d 551, 556-57 (10th Cir. 2000) ("we have held that a response to a motion for summary judgment arguing in part that the opposing party should not be held to its admissions can constitute a Rule 36(b) motion to withdraw those admissions) (citing Bergemann v. United States, 820 F.2d 1117, 1120-21 (10th Cir. 1987)).

Moreover, the Federal Rules indicate a preference for resolution on the merits.  See Fed. R. Civ. P. 36(b).  And, "courts are particularly responsive to allowing late answers to requests for admission when summary judgment is involved." Lucas v. Higher Educ. Assistance Found. (In re Lucas), 124 B.R. 57, 58 (Bankr. N.D. Ohio 1991) (citing St. Regis Paper Co. v. Upgrade Corp., 86 F.R.D. 355 (W.D. Mich. 1980).  Indeed, "[e]ntry of dismissal as a discovery sanction is a 'drastic' approach that is 'disfavored absent the most egregious circumstances.'"  Sadler v. State Farm Fire & Cas. Co., No. 08cv0951, 2008 WL 4960199, at *1 (W.D. Pa. Nov. 19, 2008) (quoting United States v. $8,221,877.16 in U.S. Currency, 330 F.3d 141, 161 (3d Cir. 2003)).  While defendants in this case were not nearly as attentive to the litigation of the admissions

issue as the plaintiffs in <u>Pritchard</u> were, resolution of a
summary judgment motion against them is, arguably, too stringent
a sanction for their lack of diligence.  Given the paramount
importance of resolving disputes on the merits when possible,
and out of an abundance of caution, the court grants defendants'
motion for reconsideration to the extent that it allows
defendants to withdraw their admissions and deems their belated
answers to be timely served.

Allowing defendants' answers to Coach's requests for
admissions, however, does not necessarily entitle defendants to
relief from the court's summary judgment order.  Rather, the
court must now perform a summary judgment analysis based upon
the undisputed evidence that remains.

### Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to a judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  "The object of summary judgment is to "pierce
the boilerplate of the pleadings and assay the parties' proof in
order to determine whether trial is actually required.'"  <u>Dávila</u>
<u>v. Corporación de P.R. para la Diffusión Pública</u>, 498 F.3d 9, 12
(1st Cir. 2007) (quoting <u>Acosta v. Ames Dep't Stores, Inc.</u>, 386
F.3d 5, 7 (1st Cir. 2004)).  "[T]he court's task is not to weigh

the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted).

"Once the moving party avers an absence of evidence to support the non-moving party's case, the non-moving party must offer 'definite, competent evidence to rebut the motion,'" Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)), and "cannot rest on 'conclusory allegations, improbable inferences, [or] unsupported speculation,'" Meuser, 564 F.3d at 515 (quoting Welch v. Ciampa, 542 F.3d 927, 935 (1st Cir. 2008)).  When ruling on a party's motion for summary judgment, a trial court "constru[es] the record in the light most favorable to the nonmovant and resolv[es] all reasonable inferences in [that] party's favor."  Meuser, 564 F.3d at 515 (citing Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002)).

### Background

As the court noted in its previous summary judgment order, along with their failure to move to withdraw their admissions, defendants have also failed to properly oppose Coach's statement of undisputed facts by "incorporate[ing] a short and concise

statement of material facts, supported by appropriate record citations, as to which the opposing party contends a genuine dispute exists so as to require a trial."  LR 7.2(b)(2). Rather, they operate as if their denials of various requests for admissions count as actual affirmative summary judgment evidence.  In any event, the following recitation of the facts to which the relevant law will be applied is drawn largely from Coach's properly supported statement of undisputed facts. However, as explained above, the court also draws upon defendants' answers to Coach's requests for admissions.[1]

Coach manufactures and sells high-end purses, handbags, and other similar items.  It also holds an extensive portfolio of intellectual property including trademarks, trade dress, and copyrights.

Gata operates a flea market in Derry, New Hampshire ("Flea Market").  Taylor is Gata's sole owner and shareholder.  Taylor Dep. (doc. no. 38-2) 7.[2]  He also works regularly at the Flea Market.  Id. at 18.  Among other things, he runs the ticket

_____

[1] As a practical matter, the principal effect of allowing defendants to amend their admissions is the loss of several admissions concerning defendants' knowledge of counterfeit merchandise at the Flea Market from 2005 through the date of the first raid on the Flea Market in 2009.

[2] Except where otherwise noted, all references to Martin Taylor's deposition are to the more complete version appended to defendants' objection to Coach's motion for summary judgment.

booth and patrols the Flea Market to check for illegal
merchandise.  Id.

In 2005, Chinese vendors from New York first began renting
spaces at the Flea Market.  Taylor Dep. 46.  Those vendors have
since come to predominate over vendors Martin refers to as the
"yard sale people."  Taylor Dep. 47:1.  With the increase in
Chinese vendors from New York has come a corresponding increase
in the number of purses offered for sale at the Flea Market.
Id. at 66-68.

The Flea Market requires purse vendors to pay a rental fee
for booth space that is higher than the fee paid by vendors who
do not sell purses.  Horton Dep. (doc. no. 31-9) 18.
Counterfeit Coach purses are distinguishable from authentic ones
on the basis of both workmanship and price, with authentic Coach
purses selling for $300, on average, and counterfeits selling at
the Flea Market for less than $20.  Walden Dep. (doc. no. 31-10)
12.

The Flea Market has been raided by federal and state law-
enforcement officers on at least four occasions, starting in
June of 2009.[3]  Defs.' Admiss. (doc. no. 38-3) # 17.  Those raids
resulted in the seizure of, among other things, counterfeit
Coach purses.  Id. # 18.  The raids also resulted in the arrest,

---

[3] Subsequent raids took place in October and December of
2009, and January of 2010.

prosecution, and conviction of several vendors for selling, among other things, counterfeit Coach merchandise.  Id. ## 19-20.  In addition, surveys conducted by Powers & Associates (a private detective agency), the federal Bureau of Immigration and Customs Enforcement, and the Derry Police have enumerated dozens of vendors offering, collectively, thousands of counterfeit items for sale at the Flea Market in early 2008, May of 2008, the end of 2008, June of 2009, October of 2009, and December of 2009.  Powers Decl. (doc. no. 31-6) ¶¶ 8, 9, 10, 12, 15, 16, 17. The last survey in 2008, both of the surveys in October of 2009, and the survey in December of 2009 all revealed counterfeit Coach merchandise being offered for sale at the Flea Market. Id. at 10, 15, 16.

By letter dated August 4, 2009, Coach's manager of intellectual property informed Taylor of Coach's concern over the sale of counterfeit Coach purses at the Flea Market and directed Taylor to take various steps to curtail those sales. Taylor Dep., Ex. 7 (doc. no. 31-5, at 28).  Prior to the first raid, defendants had no procedures in place to prevent the sale of counterfeit merchandise.  Defs.' Admiss. # 22.  Even after the raid, and after receiving Coach's letter, defendants never provided Flea Market employees with any training on how to

detect counterfeit merchandise or how to uncover surreptitious
sales of counterfeit merchandise.  Id. ## 28, 29.

　　At some point after the initial raid, defendants posted a
sign stating that no Coach merchandise could be sold at the Flea
Market.  Defs.' Admiss. # 25; Taylor Dep. 69.  Taylor testified
that the Flea Market adopted a policy that any vendor seen
selling counterfeit merchandise would have to give up his or her
spot, Taylor Dep. 69-70, but that no vender had ever had his or
her spot taken away under that policy, id. at 70.  He also
testified about an inspection of vendors' booths in August of
2010 that resulted in the confiscation of counterfeit goods but
no ejections of the offending vendors.  Id. at 73-75.  And, at
no point did defendants ever inspect vendors' merchandise before
allowing them to set up.  Defs.' Admiss. # 26; Taylor Dep. 95.

　　After the initial raid in June of 2009, surveys continued
to show that vendors at the Flea Market were offering
counterfeit Coach merchandise for sale.  Powers Decl. 15, 16,
17.  In a November 3, 2010, deposition, Gata employee Richard
Horton testified that between early April and early July of
2010, he saw purses and wallets with Coach trademarks offered
for sale at the Flea Market.  Horton Dep. (doc. no. 31-9) 22-31.
He further testified that when he found vendors with counterfeit
goods, he confiscated the merchandise and gave it to Taylor.

Id. at 32-34.  Horton estimated that over the course of the year
preceding his deposition, he confiscated counterfeit goods from
vendors, and turned them over to Taylor, between twenty-five and
fifty times.  Id. at 35.  Horton explained that vendors
generally kept counterfeit goods in their vehicles, id. at 31,
and that he observed vendors retrieving counterfeit goods from
their vehicles before selling them to customers, id. at 32.
Even so, defendants never inspected vendors' vehicles to
determine whether they were bringing counterfeit goods to the
Flea Market.  Taylor Dep. 72.

On March 20, 2010, Andrea Powers of Powers & Associates
visited the Flea Market at Coach's request.  Powers Decl. ¶ 25.
That day, Powers was able to purchase counterfeit Coach
merchandise from four vendors, all of whom concealed the
counterfeit merchandise in their booths, and took care to wrap
Powers' purchases and place them inside her tote bag, out of
view.  Id. ¶ 27.  On one visit to the Flea Market after the
initial raid, while Powers was waiting to speak with a vendor
about purchasing a counterfeit Coach purse, she overheard an
employee of the Flea Market tell a vendor with counterfeit
merchandise on display that such goods had to be kept under the
table rather than out in the open.  Id. ¶ 24.

This suit arises from Coach's allegations that numerous
vendors at the Flea Market have sold goods that infringe and/or
tarnish their trademarks, trade dress, and/or copyrights.  In
Count I of its complaint, the only claim at issue here, Coach
asserts that Gata and Taylor are liable for contributory
trademark infringement because, with actual knowledge of or
willful blindness to the infringing conduct of Flea Market
vendors, they have permitted those vendors to sell items that
infringe Coach's trademarks.

## Discussion

Coach moves for summary judgment on Count I, arguing that
on the undisputed facts, it is entitled to judgment as a matter
of law that defendants are liable for contributory trademark
infringement.  Without properly identifying any factual disputes
that would preclude summary judgment, defendants argue that: (1)
summary judgment is rarely granted in willful blindness cases;
(2) the standard for establishing willful blindness is exacting;
and (3) the evidence does not support summary judgment.
Defendants' third argument is based, in large measure, on a
page-long list of "important denials" contained in its answer to
Coach's requests for admissions and testimony from Taylor's
affidavit and deposition.  But, as the court has already noted,

defendants nowhere identify any specific genuine dispute over a material fact that would preclude summary judgment for Coach.

### A. Contributory Trademark Infringement

The Lanham Act identifies several forms of conduct that constitute actionable trademark infringement.  See 15 U.S.C. §§ 1114(a) & 1125(a).  Liability under the Lanham Act may be imposed not just on direct infringers, but also on those who induce or facilitate the infringing conduct of others.  See Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 853-54 (1982)).  In a case that involved claims that a generic drug manufacturer was liable for contributory trademark infringement, the United States Supreme Court explained:

> [I]f a manufacturer or distributor intentionally
> induces another to infringe a trademark, or if it
> continues to supply its product to one whom it knows
> or has reason to know is engaging in trademark
> infringement, the manufacturer or distributor is
> contributorially responsible for any harm done as a
> result of the deceit.

Id. at 854 (citing William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526 (1924); Coca-Cola Co. v. Snow Crest Bevs., Inc., 64 F. Supp. 980 (D. Mass. 1946)).  The doctrine of contributory trademark infringement has been extended from the factual context in which it first arose into settings substantially analogous to the one presented here.

In a case involving a claim of contributory trademark
infringement brought against the operator of a flea market that
included vendors selling infringing goods, the Seventh Circuit
held "that the Inwood Labs. test for contributory liability
applie[d]" and that the flea-market operator could "be liable
for trademark violations by [a vendor] if it knew or had reason
to know of them."  Hard Rock Cafe Licensing Corp. v. Concession
Servs., Inc., 955 F.2d 1143, 1149 (7th Cir. 1992).  The court
went on to hold that the knowledge requirement could be met by a
demonstration of willful blindness, id. (citation omitted),
which it defined as follows: "To be willfully blind, a person
must suspect wrongdoing and deliberately fail to investigate."
Id. (citation omitted).  The court further explained that "the
'reason to know' part of the standard for contributory liability
requires [the defendant] to understand what a reasonably prudent
person would understand."  Id.  Ultimately, the court of appeals
vacated the trial court's decision in favor of the trademark
owner, after a bench trial, because the trial court used a
standard for knowledge that was more akin to negligence than
willful blindness.  Id.

In another flea-market case, the Ninth Circuit reversed the
trial court's dismissal of a claim for contributory trademark
infringement against a swap meet, explaining that "Hard Rock

*Cafe*'s application of the *Inwood* test is sound; a swap meet can not disregard its vendors blatant trademark infringements with impunity." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 265 (9th Cir. 1996).

In *Tiffany (NJ) Inc. v. eBay Inc.*, a case in which the defendant was the operator of an on-line marketplace, the Second Circuit restated the *Inwood* test to make it more applicable to an accused contributory infringer that provides services rather than goods:

> [W]hen applying *Inwood* to service providers, there are two ways in which a defendant may become contributorially liable for the infringing conduct of another: first, if the service provider "intentionally induces another to infringe a trademark," and second, if the service provider "continues to supply its [service] to one whom it knows or has reason to know is engaging in trademark infringement."

600 F.3d 93, 106 (2d Cir. 2010) (quoting *Inwood*, 456 U.S. at 854).  In the district court order holding the defendant not to be liable for contributory infringement that was affirmed in *Tiffany*, the trial judge explained: "Willful blindness requires 'more than mere negligence or mistake' and does not lie unless the defendant knew of a high probability of illegal conduct and purposefully contrived to avoid learning of it, for example, by failing to inquire further out of fear of the result of the inquiry." *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463,

515 (S.D.N.Y. 2008) (quoting <u>Nike Inc. v. Variety Wholesalers,</u>
<u>Inc.</u>, 274 F. Supp. 2d 1352, 1369-70 (S.D. Ga. 2003)).

### B. Defendants' Arguments Against Summary Judgment

Based on their objection to Coach's motion for summary
judgment, defendants appear to concede the underlying acts of
direct trademark infringement by Flea Market vendors, in
violation of 15 U.S.C. §§ 1114(a) and 1125(a), on which Count I
is based.  Their objection to summary judgment rests on one
factual argument and one legal argument.  Factually, they argue
that Coach has not met its burden of producing evidence that
they possessed the requisite level of specific knowledge of
infringing activity to be held liable for contributory
infringement.  Legally, they argue that Coach overstates the
amount of affirmative action they were required to take to
police Coach's trademarks.  The court considers each argument in
turn.

### 1. Defendants' Knowledge of Infringement

Defendants' factual argument is based on the opinions in
<u>Tiffany</u>, and in particular, the holding that "[f]or contributory
trademark infringement liability to lie, a service provider must
have more than a general knowledge or reason to know that its
service is being used to sell counterfeit goods."  600 F.3d at

17

107.  According to defendants, Coach has failed to produce
evidence that they had anything more than general knowledge of
infringing activities at the Flea Market.  The court does not
agree.

     As a preliminary matter, the court notes that Tiffany, and
the two cases on which it relies in its discussion of general
knowledge, Inwood and Sony Corp. of America v. Universal City
Studios, Inc., 464 U.S. 417 (1984), involved situations where
the infringing activity and the alleged contributory infringer
were physically remote from one another.  In Tiffany, the direct
infringers were sellers using the defendant's online
marketplace.  600 F.3d at 96.  In Inwood, the direct infringers
were pharmacists who dispensed a generic drug manufactured by
the defendant.  456 U.S. at 846.  In Sony, the direct infringers
were people who used devices manufactured by the defendant to
record television programs in their homes.  464 U.S. at 419.
Here, by contrast, the direct infringers are vendors who bring
their merchandise to a venue operated and patrolled by
defendants on a daily basis.  The issue of proximity, in turn,
is related to the issue of control, which is a key component of
the analysis:

        [T]he Ninth Circuit concluded that Inwood's test for
        contributory trademark infringement applies to a
        service provider if he or she exercises sufficient
        control over the infringing conduct.  Lockheed Martin

18

> Corp. v. Network Solutions, Inc., 194 F.3d 980, 984
> (9th Cir. 1999); see also id. ("Direct control and
> monitoring of the instrumentality used by a third
> party to infringe the plaintiff's mark permits the
> expansion of Inwood Lab.'s 'supplies a product'
> requirement for contributory infringement.").

Tiffany, 600 F.3d at 104-05.  Suffice it say that the operator

of a flea market that rents spaces to vendors exercises

substantially more control over potential direct infringers than

the defendants in Tiffany, Inwood, and Sony exercised over the

direct infringers in those case.

Given the circumstances of this case, Coach has met its

burden of producing undisputed evidence of defendants' knowledge

of the underlying infringement.  It is undisputed that: (1)

"Prior to the 2009 and 2010 raids on the . . . Flea Market by

federal and local law enforcement officials, the Counterfeit

Merchandise offered for sale at the Flea Market, including the

Counterfeit Coach Merchandise, was openly displayed for sale by

vendors at the . . . Flea Market," Defs.' Admiss. # 36; (2) a

reasonable person could have easily identified the counterfeit

goods offered for sale at the Flea Market based on their

dramatically low prices;[4] (3) after the initial raid, Richard

Horton saw several different items of counterfeit Coach

---

[4] As Hard Rock Cafe makes clear, the "reason to know"
standard is based on what a reasonably prudent person would
understand, see 955 F.2d at 1149, not what would be understood
by a person as uninformed as Taylor makes himself out to be in
his affidavit, see Defs.' Obj., Ex. A (doc. no. 38-1) ¶¶ 2-5.

merchandise offered for sale at the Flea Market; (4) both Horton
and Taylor actually confiscated counterfeit merchandise from
vendors at the Flea Market; and (5) at least one Flea Market
employee actively instructed a vendor on how to sell counterfeit
merchandise while avoiding detection.

Beyond that, once law-enforcement agencies began raiding
the Flea Market, arresting vendors, and seizing counterfeit
merchandize, any lack of specific knowledge on defendants' part
could only have resulted from willful blindness; those raids
provided defendants with a veritable roadmap to infringing
vendors and merchandise.  Similarly, the fact that defendants
did not train the employees tasked with detecting counterfeit
merchandise, and their failure to inspect vendors' vehicles,
count as deliberate failures to investigate suspected infringing
activity, see Hard Rock Cafe, 955 F.2d at 1149, or a purposeful
contrivance to avoid learning of infringing activity, see
Tiffany, 576 F. Supp. 2d at 515.  Either a deliberate failure to
investigate or a purposeful contrivance to avoid learning of
infringing activity is sufficient to establish willful
blindness.  In sum, the court the concludes that Coach has
produced undisputed evidence that defendants rented spaces at
the Flea Market to vendors it knew, or should have known, were
engaging in infringing activity.

### 2. Defendants' Obligation to Prevent Infringement

Defendants' principal argument is the one addressed above, i.e., that Coach has failed to produce undisputed evidence that they knew about, or should have known about, the infringing activity of vendors at the Flea Market.  Defendants also appear to raise – but not fully develop – a second argument related to the degree to which they were legally obligated to monitor and control the activities of their vendors.  In defendants' view, the various steps they took to clamp down on infringing activity after the 2009 raid were sufficient under the law.  In so arguing, defendants rely on Tiffany for the proposition that the law did not require them to further police Coach's trademarks. In terms of the elements of Coach's cause of action, the obligation of a person in defendants' position to prevent infringement by another would appear to derive from the rule that one who has knowledge of the infringing acts of another is liable for that other person's infringement when he or she "continues to supply [a] [service] to [the infringer]." Tiffany, 600 F.3d at 106.

In Tiffany, there were two categories of underlying infringers: (1) those that eBay knew to be selling counterfeit goods; and (2) those that Tiffany said eBay should have known to be selling counterfeit goods.  The former are the proper analog

to the infringers in this case, given the undisputed fact that
defendants had sufficient knowledge of the infringing acts of
the Flea Market's purse vendors.  With respect to those eBay
knew to be selling counterfeit goods, as soon as "eBay [had]
reason to know that particular listings were for counterfeit
goods, eBay did not continue to carry [their] listings."  600
F.3d at 106.  Moreover:

> The [trial] court found that eBay's practice was
> promptly to remove the challenged listing from its
> website, warn sellers and buyers, cancel fees it
> earned from that listing, and direct buyers not to
> consummate the sale of the disputed item.  The court
> therefore declined to hold eBay contributorially
> liable for the infringing conduct of those sellers.

Id. (citations to the district court order omitted).  The
plaintiff in Tiffany did not challenge that ruling, and the
court of appeals agreed with the trial court.   Id.

Here, defendants' handling of the vendors it knew or should
have known to be infringing Coach's trademarks falls far short
of the standard the Tiffany Court held to be sufficient to avoid
liability for contributory infringement.  It is undisputed that
after the first raid on the Flea Market, defendants took only
two steps to prevent the sale of counterfeit Coach merchandise:
posting a sign stating that no Coach merchandise could be sold
at the Flea Market and conducting walk-throughs to see whether
any counterfeit Coach merchandise was being sold.  It is also

undisputed that: (1) defendants did not inspect vendors'
merchandise before allowing them to set up; (2) defendant did
not inspect vendors' vehicles, notwithstanding Richard Horton's
direct observation that vendors often used their vehicles to
store counterfeit merchandise out of sight; (3) the employees
conducting walk-throughs of the Flea Market were not trained in
how to detect counterfeit merchandise or sales thereof; and (4)
on dozens of occasions, Flea Market employees confiscated
counterfeit goods while allowing the sellers of those goods to
keep their spots at the Flea Market.

Unlike eBay, which disallowed infringers from using its
service, defendants in this case have never asked a vendor to
leave the Flea Market for selling counterfeit Coach items.  This
is so, notwithstanding Taylor's testimony that after the first
raid, the Flea Market instituted a policy of evicting vendors
for selling counterfeit goods.  Moreover, it is undisputed that
two of the Flea Market's employees have caught vendors in the
act of selling counterfeit name-brand merchandise on at least
twenty-five occasions.  It is further undisputed that on at
least one occasion, a Flea Market employee counseled a vendor on
how to hide counterfeit merchandise in his or her booth.  The
fact that a Flea Market employee actually taught a vendor how to
conceal infringing merchandise drifts perilously close to, and

may well cross, the line between allowing known infringers to
use the Flea Market's services and actually inducing
infringement.

The bottom line is this.  Like the defendant in <u>Tiffany</u>,
defendants in this case knew that vendors were using the service
they provided to conduct infringing activities.  The defendant
in <u>Tiffany</u> barred those known infringers from using its service.
Gata and Taylor did not.

Because the undisputed factual record demonstrates that
defendants continued to supply the services of the Flea Market
to vendors it knew to be engaging in trademark infringement
and/or vendors it had reason to know were engaging in trademark
infringement, Coach is entitled to judgment as a matter of law
on Count I.

### Conclusion

For the reasons given, the court grants defendants' motion
for reconsideration (doc. no. 57), but only to the extent
allowing defendants to withdraw and amend their answers to
Coach's requests for admissions.  Having taken that step,
however, the court still rules that Coach is entitled to
judgment as a matter of law on Count I.  Elimination of several
of the admissions upon which Coach and the court previously
relied may have an impact on the span of time for which damages

are available, but even without those admissions, Coach has

produced undisputed evidence that defendants are liable for

contributory trademark infringement.  Accordingly, the grant of

summary judgment to Coach on Count I still stands.

        SO ORDERED.

                                    _____
                                    Landya McCafferty
                                    United States Magistrate Judge


June 9, 2011

cc:  Kelly Martin  Malone, Esq.
     Thomas Morgan, Jr., Esq.
     Adam M. Ramos, Esq.
     Jeffrey K. Techentin, Esq.